## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

```
DEBRA L. WATSON,                )
                                )
        Plaintiff,               )
                                )
    v.                           )    No. 05-1104
                                )
JO ANNE BARNHART,               )
Commissioner of Social Security,)
                                )
        Defendant.               )
```

## ORDER

This matter is now before the Court on Plaintiff's Motion for Summary Judgment [Doc. # 14] and Defendant's Motion for Summary Affirmance [Doc. # 18].  For the reasons set forth below, Plaintiff's Motion for Summary Judgment [Doc. # 14] is DENIED and Defendant's Motion for Summary Affirmance [Doc. # 18] is GRANTED.

### I.
### BACKGROUND

Watson, a 46-year old female, filed for Disability Insurance Benefits (DIB) and Supplemental Security Income Benefits on February 21, 2001, alleging a disability onset date of July 12, 2000. (R. at 117.)  Watson alleged disability due to weakness, muscle deterioration, and pain.  (R. at 130.)

The record reveals the following regarding Watson's medical condition.  In September 2000, Watson was examined by Dr. Bremer at the Carle Foundation Hospital. (R. at 224-28.)  She complained of involuntary muscle movements over her entire body, generalized weakness, slowed thinking and reasoning, and abnormal speech. (R.

at 227-28). She had headaches, vision trouble, dizziness, paresthesias and muscle pain. (R. at 227-28.) She stated she was taking Syntrhoid, Amitriptyline, Pergolide, Paxil, Celebex, multivitamin and stool softener. (R. at 227-28). Dr. Bremer noted she had a history of fibromyalgia[1] and indicated concerns for involuntary movement disorder and possible myopathy. (R. at 224.) After Watson's return visit later that month Dr. Bremer again noted that she might have fibromyalgia. (R. at 222.) He did not see any need for further neurologic testing and encouraged Watson that her exam was normal. (R. at 222.)

In December 2000, Watson was seen by Dr. Johnson at the Carle Foundation Hospital. (R. at 220-21.) She was diagnosed with diffuse musculoskeletal pain, severe depression with somatic complaint, flat effect, frustration, and difficulty expressing herself. (R. at 220.)

In January 2001, Dr. Adkins indicated that Watson had an exacerbation of her fibromyalgia, was extremely fatigued, had difficulty concentrating and experienced incapacitating rigidity

---

[1] Fibromyalgia, also known as fibrositis, or "inflammatory hyperplasia of the white fibrous tissue of the body, especially of the muscle sheaths." MEDICAL DICTIONARY 630 (27th ed. 1988). Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. Its principal symptoms are "pain all over", fatigue, disturbed sleep, stiffness, and multiple tender spots in 18 fixed locations on the body. See Frederick Wolfe et. al., *The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia: Report of the Multicenter Criteria Committee*, 33 Arthritis and Rheumatism 160 (1990).

and weakness. (R. at 217.) Watson was treated with anti-depressants and anti-inflammatory medication. (R. at 217.)

In a March, 2001 intake assessment, Watson stated that she had trouble coping with everyday life, had mood swings, and was sometimes bedridden due to either her physical ailments or her depression. (R. at 385.) Her therapist, Ariane Phillip, noted that Watson had depression due to a deterioration of fibromyalgia. (R. at 317.)

In April 2001, Dr. Lanier performed a consultative psychological evaluation of Watson, and concluded that she functioned in the low normal intellectual range and appeared to exhibit a mild depressive disorder with possible features of a personality disorder. (R. at 280.)

In May 2001, Dr. Kuester opined that Watson was moderately limited in her ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the public, and respond appropriately to supervisors. (R. at 282-83.) According to Dr. Kuester, Watson could perform simple tasks routinely with ordinary supervision but should not have to deal with the public. (R. at 285.) In a Psychiatric Review Technique form, Dr. Kuester opined that Watson suffered from affective disorders, including a depressive syndrome which caused mild restriction of activities of daily living, mild difficulties in maintaining social functioning,

and moderate difficulties in maintaining concentration, persistence, and pace. (R. at 296.)

In July 2001, Dr. Francis evaluated Watson and reported that he felt it was reasonable to approach her discomfort from a fibromyalgia point of view and emphasized that the gradual onset of exercise is the cornerstone therapy for her disorder. (R. at 313.)

In August 2001, Dr. MacLean reviewed the record evidence and concluded that Watson had mild depression and could understand, remember, and carry out simple tasks. (R. at 308-11, 322-35.) According to Dr. MacLean, Watson was able to make simple work-related decisions, get along with others, and cope with changes in simple work situations (R. at 310.) He also noted that Watson's limitations of adaptive functioning appeared to be primarily secondary to her physical impairments. (R. at 334.)

In November 2001, psychiatric therapist Ariane Philipp completed a "Psychological/Psychiatric Impairment Report" and indicated that Watson was diagnosed with an adjustment disorder with depressed mood (R. at 355-61.) She discussed Watson's weakness and indicated that it rendered her unable to commit to social responsibilities, and noted Watson's muscle pain caused her to lose all sense of organization and follow-up. (R. at 359.) She opined that it was physically and emotionally impossible for Watson to fulfill the responsibilities of a job. (R. at 360.)

In March 2002, Dr. Francis observed that Watson's

4

fibromyalgia-like symptoms were under good control due to an increased activity level and weight loss. (R. at 394.) However in January 2003, Dr. Francis reported that Watson's condition had worsened, as she was no longer exercising as before. He then discussed with her the importance of re-starting a gradual onset of exercise program. (R. at 393.) He found that she continued to have diffuse pain syndrome consistent with fibromyalgia and depression associated with the condition. (R. at 393.)

In July 2003, Dr. Kale completed a "Fibromyalgia Residual Functional Questionnaire" and opined that Watson met the American Rheumatological Society's criteria for fibromyalgia and that her prognosis was poor. (R. at 398.) He opined that Watson had very extreme functional limitations. (R. at 398-99.)

At the October 28, 2003, administrative hearing, Watson (who was represented by counsel) testified to the following. Her last employment was as an in-home caretaker. (R. at 33.) She claimed that she experiences extreme fatigue, pain, headaches, difficulty concentrating and speaking, (R. at 37) and trouble with her memory (R. at 51). She stated that her pain medications help and Amitriptyline helps her sleep most of the time. (R. at 38.) She stated that the only side effect is dry mouth. (R. at 38.) She testified that she is able to do dishes, fix meals, do small loads of laundry, go grocery shopping with her husband, watch television, and read the Bible and mysteries. (R. at 39-40.) She last went to

church two months earlier.  (R. at 40.)  She testified that she babysits a friend's children maybe twice a month, although she never has her grandchildren over without her husband or daughters there because of the stress.  (R. at 41.)  She uses the computer and email, but if she did not use it more than once a week she forgets how.  (R. at 42.)  She admitted to being able to sit through a 12-hour drive to Arkansas earlier in the year.  (R. at 42.)  She also stated that she helped plant in her garden.  (R. at 44.)

Additionally, Watson's husband testified at the hearing that he had been married to Watson for twenty years, that Watson used to be a workaholic and liked to be busy all of the time, and that since her disability she was in a lot of pain.  (R. at 79-80.)  He testified that she experienced fatigue, had trouble comprehending and remembering, and that she was depressed.  (R. at 81-84.)  Watson's daughter wrote in an October 23, 2003 letter that her mother was sometimes so worn out that she could not go to church, and when they went to the store, Watson had to sit down or lean on her shoulder to hold herself up.  (R. at 191-192.)

At the hearing, the Administrative Law Judge ("ALJ") asked Ms. Gladden, the vocational expert, whether a hypothetical individual with the same vocational characteristics as Watson could perform her past work, if that person were limited to light and sedentary work with the exception of jobs that would require climbing or

working at unprotected heights or around unprotected hazardous machinery, or more than routine or repetitive tasks. (R. at 58.)

In response, the vocational expert stated that such an individual could not perform any of the claimant's past work, with the exception of the clerical part of the rental work and operating the sewing machine. (R. at 58-59.) The hypothetical individual could perform the unskilled light jobs of office helper, laundry worker, room cleaner, packing and filling machine operator, cashier, and small product assembler. (R. at 59-60). According to the vocational expert these jobs numbered 204,633 in the state of Illinois. (R. at 59-60.)

The ALJ found that Watson had severe impairments. (R. at 24.) However, the ALJ found that Watson did not have an impairment or combination of impairments listed in or medically equal to the impairments listed in the regulations. (R. at 24.) The ALJ found Watson's allegations regarding her subjective symptoms and functional limitations were not fully credible. (R. at 24.) He concluded that Watson had the residual functional capacity to perform the exertional and non-exertional requirements of light and sedentary work except for performing work requiring any climbing or exposure to hazardous unprotected machinery or unprotected heights, or more than routine and repetitive tasks. (R. at 25.) The ALJ concluded that there were a significant number of jobs in the national economy which she could have performed on or before

December 31, 2000. (R. at 25.) Accordingly, the ALJ found Watson was not disabled and not entitled to benefits. (R. at 25.)

Watson appealed the ALJ's decision and the Appeals Council denied her request for review. (R. at 6-8.) Thereafter, Watson filed this civil action for review of the decision denying her benefits. Watson has moved for summary judgment and the Commissioner has moved for summary affirmance.

## II.
## LEGAL STANDARD

In order to be entitled to DIB benefits, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled. See 20 C.F.R. § 404.1505. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. See 20 C.F.R. § 404.1566.

The establishment of disability under the Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. See 42 U.S.C. § 1382c (a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. See McNeil v. Califano, 614 F.2d 142, 143 (7th Cir.

1980). That factual determination is made by using a five-step test. See 20 C.F.R. §§ 404.1520.

The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed; (2) is the plaintiff's impairment "severe" (20 C.F.R. § 404.1521,); (3) does the impairment meet or exceed one of the list of specified impairments (20 C.F.R. Pt. 404, Subpt. P, App. 1); (4) is the plaintiff unable to perform his or her former occupation; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. See Garfield v. Schweiker, 732 F.2d 605, 607 n.2 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. See Tom v. Heckler, 779 F.2d 1250, 1253 (7th Cir. 1985); Halvorsen v. Heckler, 743 F.2d 1221, 1225 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of

the evidence.  See Pugh v. Bowen, 870 F.2d 1271, 1274 (7th Cir. 1989).  The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied.  See Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).  An ALJ's credibility determination will not be disturbed unless it is patently wrong.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

## III.
## ANALYSIS

In her motion for summary judgment, Watson argues (1) that the ALJ failed to properly credit her testimony, (2) that the ALJ ignored evidence of fatigue that supported Watson's claim, and (3) the ALJ's residual functional capacity finding was insufficient.

**A.    The ALJ's decision to discredit Watson's testimony is not patently wrong.**

Watson argues that the ALJ should have accepted her testimony regarding her physical and mental limitations.  At the administration hearing, Watson testified that she experienced pain and extreme fatigue, brought on by "doing too much", that would continue for hours at a time.  In fatigue questionnaires, Watson stated that she had difficulty standing and walking long enough to

complete her household chores. However Watson's self-reported daily activities belie her assertions regarding the severity of her symptoms and limitations. Watson testified that she could fix meals, dust, do laundry, wash dishes, and that she goes grocery shopping with her husband, helps plant in her garden, drives, sews with her daughter-in-law, uses the computer to email and occasionally baby-sits for two small children. It was thus reasonable for the ALJ to give less weight to Watson's testimony regarding her subjective complaints, and the Court finds the ALJ was not patently wrong in determining Watson's assertions regarding her own limitations were not entirely credible. See Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995); see also Carradine v. Barnhart, 360 F.3d 751, 753 (7th Cir. 2004) (review of ALJ's credibility determinations is highly limited because the reviewing court lacks the trier's immersion in the case as a whole and lacks the trier's experience with the type of case under review).

The ALJ's assessment of Watson's credibility is further supported by the ALJ's consideration of the degree to which the objective medical evidence, medications taken, and treatment supported the degree of severity of Watson's subjective complaints. Rice v. Barnhart, 384 F.3d 363, 374 (7th Cir. 2004) (ALJ's negative determination of credibility upheld where ALJ properly considered objective medical evidence, [claimant's] daily activities, medications taken, and treatment).

The medical evidence includes a diagnosis by Watson's treating physician in September 2000, that her sedimentation rate was normal; a neurological evaluation in January 2001, by Dr. Johnson that was unremarkable; a report by Dr. Francis in March 2002, that Watson's symptoms were "fibromyalgia-like" but "under good control with her activity level"; and an evaluation in January 2003, by Dr. Francis that Watson had normal strength and appeared to be healthy.

While, as Watson argues, the normal neurological evaluation and normal sedimentation rate may not be dispositive of the severity of her impairments, Dr. Johnson's report and Dr. Francis' evaluation support the ALJ's decision. See Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996) ("[i]f the administrative law judge believed the medical reports that found [claimant] had enough strength to work and disbelieved [claimant's] own testimony, this would compel the denial of the application for benefits").

Furthermore, Watson's medications, which included Celebrex and Darvocet, helped most of the time, and caused only minimal side effects. Watson's treatment has consisted of the gradual onset of exercise, which also detracts from Watson's complaints regarding her impairments and limitations.

Watson's reliance on Carradine v. Barnhart, 360 F.3d 751 (7th Cir. 2004), is unavailing, as that case is inapposite and distinguishable from the facts here. First, in Carradine, the Seventh Circuit stated that "to insist in such a case, as the

social security disability law does not, that *the subjective complaint, even if believed by the trier of fact*, is insufficient to warrant an award of benefits would place a whole class of disabled people outside the protection of the law." 360 F.3d at 753 (emphasis added). As the ALJ did not believe Watson's complaints, based on the reasons discussed above, this concern is not present here.

Furthermore, the court in Carradine found that evidence of the claimant's surgical implantation in her spine of a catheter and a spinal cord-stimulator made it unlikely that plaintiff was faking her symptoms. Id. at 755. Similarly, in Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998), the court "questioned whether a claimant . . . who undergoes three back surgeries in the hopes of alleviating the pain and who now lives with a morphine pump implanted in her body, can be found not credible regarding her complaints of pain." Watson's medical record, to the contrary, does not demonstrate how her fibromyalgia was so severe as to support her testimony regarding her pain and fatigue. When evaluated in light of the whole record, Watson's arguments fail to establish the ALJ's opinion must be considered unreasonable.

**B.   The ALJ Did Not Ignore Evidence of Fatigue and the Residual Functional Capacity Finding Was Sufficient.**

Futhermore, contrary to Watson's claim that the ALJ ignored an entire line of evidence concerning Watson's symptom of fatigue,

13

this symptom was sufficiently considered throughout the ALJ's analysis. The ALJ's credibility determination is supported by her observation that while in fatigue questionnaires in March 2001 and July 2001, the claimant reported difficulty standing and walking for long enough to complete her household chores, Watson also stated in a daily activities questionnaire that she was able to fix meals, dust, do some laundry, and pull weeds in her garden. (R. at 21, ¶ 2.)

In addition, the ALJ's residual functional capacity finding is supported by evidence regarding Watson's fatigue. In <u>Indoranto v. Barnhart</u>, 374 F.3d 470, 474 (7th Cir. 2004), the court noticed that the ALJ failed to discuss the claimant's headaches and blurred vision when finding she could do jobs that allowed for a low level of concentration, because "concentration is not the same thing as vision." This is distinguishable from the instant case, where fatigue was clearly incorporated in the ALJ's finding that Watson was able to perform the exertional and non-exertional requirements of light and sedentary work.

Finally, Watson's moderate limitations in maintaining concentration, persistence or pace are also correctly incorporated in the ALJ's hypothetical posed to the vocational expert. The ALJ found that Watson "is limited to routine and repetitive tasks due to moderate problems with concentration". (R. at 22.) Watson's reliance on <u>Kasarsky v. Barnhart</u>, 335 F.3d 539, 544 (7th Cir.

2003), where the court found that the ALJ omitted the claimant's deficiency in concentration entirely, is therefore unpersuasive.

## CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment [Doc. # 14] is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Affirmance [Doc. # 18] is GRANTED.

CASE TERMINATED.

Entered this  21st  day of June, 2006.

                                                     /s/  Joe B. McDade
                                                         JOE BILLY McDADE
                                        United States District Judge